**WATERFIELD MORTGAGE COMPANY, INC., Appellant,**

v.

**Daniel RODRIGUEZ and Doris Rodriguez, Appellees.**

No. 04–95–00177–CV.

Court of Appeals of Texas, San Antonio.

Sept. 11, 1996.

William S. Pesota, Sharon A. Waggner, David L. Rosenberg, Waggner & Pesota, Houston, for appellant.

Joe Stenberg, San Antonio, for appellee.

Before RICKHOFF, HARDBERGER and DUNCAN, JJ.

## OPINION

HARDBERGER, Justice.

This is a Texas Debt Collections Statute case. The lender, Waterfield Mortgage

Company, Inc. (Waterfield), was found by the trial court, sitting without a jury, to have violated the statute. The plaintiffs/appellees, the Rodriguezes, (Rodriguez) were awarded $7,402.61 in actual damages, $7,500.00 in attorney's fees, and $15,000.00 in exemplary damages. Waterfield appeals. We affirm.

## FACTS AND DISCUSSION

Waterfield made a loan to the parents of the Rodriguez family to buy a house in Seguin. The promissory note was for $26,600.00 dated June 3, 1983 and was secured by a deed of trust on the property. In 1989 the Rodriguez family took over the note and the property was conveyed to them.

Rodriguez was not a model payment-maker. Payments were often late, but Waterfield was always paid eventually. Getting behind in the payments, being reminded of the delinquency, and then bringing the payments to date, with late charges, was the routine. Both parties seemed to accept this as the usual course of business. On July 21, 1993, though, trouble came.

Rodriguez received a letter from Waterfield that the loan was in default for nonpayment of three monthly installments. Including late charges, this amounted to $1,159.72. The August payment also loomed large in the near future.

On August 31, 1993, Waterfield received a personal check from Rodriguez for $1,468.00: enough to pay the four past installments, but short the late charges. There is disputed testimony about whether this check would have cleared had it been processed. We'll never know because Waterfield sent it back on September 1, 1993, along with a letter saying Rodriguez now owed $1,537.16, which included the September installment and an additional late charge. This letter is not in evidence and there is some conflict about the exact language. The Rodriguezes testified there were no time limits as to when the $1,537.16 was due. Mrs. Rodriguez testified that she called Waterfield and was told that if she and her husband sent in the $1,537.61 there would be no foreclosure. Waterfield testified they don't have any record of the call.

Rodriguez sent a cashiers check for the requested $1,537.16 to Waterfield by express mail on September 17, 1993. It is the Rodriguezes' position that at that time they had done everything that had been requested of them. But, alas, Waterfield did not share this opinion. Too little, too late was their reaction. So they returned this cashiers check, just as they had the earlier personal check. Waterfield now required $2,823.15 because of foreclosure expenses incurred on September 9, payable by October 5, or they would foreclose. The Rodriguezes didn't receive this new demand, that included their returned cashiers check, until October 6. Their home had been sold in a foreclosure sale the day before.

Waterfield then filed a forcible entry and detainer suit in justice court. They were successful and conveyed the property to the FHA. Rodriguez brought this suit against Waterfield under the Deceptive Trade Practices Act (DTPA) and the Texas Debt Collection Statute, alleging that Waterfield violated both. The DTPA claim was later dismissed.

The trial court's findings of fact found that:

14. For the want of $69.16 and due to the conduct of the Defendant, Defendant wanted the Plaintiffs to lose Plaintiff's residence.

15. Defendant undertook a course of conduct which was callous and a wanton disregard of the rights and plight of the Plaintiffs.

16. The effect of Defendant's conduct was that Plaintiffs were wrongfully misled by Defendant into believing, from September 17th through October 6th, that the Plaintiffs had in fact complied with the requests of Defendant in order to cease foreclosure proceedings.

In its Conclusions of Law, the trial court found:

5. Defendant's conduct violated the Texas Debt Collection Act art. 11.05(g), i.e., misrepresented the character, extent, or amount of a debt against a consumer.

6. Defendant's herein referenced wrongful conduct has caused Plaintiffs loss and legal damages, Said damages include loss of the herein referenced residence, loss of

title/clouding of title/slander of title concerning said residence, and, harm to credit reputation, credit worthiness, and credit history, mental anguish, emotional distress, anxiety, depression, humiliation, with said damages being in the amount of $7,402.61.

The trial court, as earlier stated, also awarded attorneys fees of $7,500.00 and $15,000.00 exemplary damages.

## POINTS OF ERROR

Waterfield brings five points of error. Four of the five points are no evidence or insufficient evidence points related to the court's basic findings and the awarding of damages, both actual and exemplary. Point five is that Waterfield has a meritorious defense of bona fide error as a matter of law. No attack is made on the award of attorney's fees. For ease of discussion, this court will break the opinion down to the trial court's finding of a violation of the Texas Debt Collection Statute and the actual damages that result. Then we will discuss the exemplary damages points of error.

## THE TEXAS DEBT COLLECTION STATUTE AND ACTUAL DAMAGES

▆ The trial court made a specific conclusion of law that Waterfield's conduct violated the Texas Debt Collection Act art. 11.05(g). This statute states:

No debt collector may collect or attempt to collect debts or obtain information concerning a consumer by any fraudulent, deceptive, or misleading representations which employ the following practices:

(g) misrepresenting the character, extent, or amount of a debt against a consumer, or misrepresenting its status in any judicial or governmental proceedings;

TEX.REV.CIV.STAT.ANN. art. 5069–11.05(g) (Vernon 1987).

▆ The trial court made a number of findings to support the conclusions of law summarized above in the discussion of the case. It is to be noted that the trial court in this case sat as the trier of fact, and was in a position to judge the credibility of the witnesses and the weight of the evidence. We apply the same standards to a challenge for sufficiency of evidence as in a jury trial. *Southern States Transp., Inc. v. Texas,* 774 S.W.2d 639, 640 (Tex.1989). In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If the evidence offered on a fact is more than a scintilla we will overrule the point of error. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). In considering a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

It is undisputed that Rodriguez made at least two efforts to bring his payments current. In each case, Waterfield would simply up the demand and return the check. When Rodriguez sent the personal check on August 31 in the amount of $1,468.00 for four monthly installments, he was current except for the late charges. It is not entirely clear why Waterfield did not accept this check and add the late charges onto the next payment. We recognize that Waterfield testified, without contradiction, that they telephoned the drawee bank and were told the check would not clear for want of sufficient funds. On the other hand, Mrs. Rodriguez testified they intended to put enough funds in the bank to cover the check. Whether this would have been done or not was never tested by sending the check to the bank. The reason given for not accepting the check at the time was not that it would bounce, but that it was insufficient by $69.16 for the late charges. The newly demanded sum of $1,537.16, made on September 1, was met fully on September 17 by cashiers check. There is no question this check was good and met the last demand completely. A week later, however, Waterfield also rejected this check and raised their demand to $2,823.15 because of posting and

reinstatement fees. Rodriguez testified he would have even paid this, but he never was given the chance because the foreclosure sale occurred before he received the notice. Thus, a home that had been in the Rodriguez family for ten years was irrevocably lost even though the Rodriguezes were desperately trying to meet the escalating demands. We recognize the testimony of Waterfield that they tried to get in touch with Rodriguez to tell him he owed more money and that foreclosure was imminent, but could not because the phone was disconnected. Accepting that though, the haste in pushing through foreclosure, then forcible entry and detainer, and selling the family home while the owner is offering the money that would essentially bring him current, is ample evidence to support the trial court's findings and conclusions of law in the area of actual damages and violation of the Texas Debt Collection Statute.

## EXEMPLARY DAMAGES

█ Punitive damages have been awarded in a number of cases involving the Texas Debt Collection Statute. *E.g. Marlow v. Medlin*, 558 S.W.2d 933, 938 (Tex.Civ.App.—Waco 1977, no writ); *Bank of North America v. Bell*, 493 S.W.2d 633, 636 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); *cf. Brown v. Oaklawn Bank*, 718 S.W.2d 678, 680 (Tex.1986). The statute itself is silent on any specific language involving exemplary or punitive damages. *See* TEX.REV.CIV.STAT. ANN. arts. 5069–11.01—11.11 (Vernon 1987). However all common law remedies are preserved by the statute:

> None of the provisions of this Act shall affect or alter any remedies at law or in equity otherwise available to debtors, creditors, governmental entities, or any other legal entity.

TEX.REV.CIV.STAT.ANN. art. 5069–11.11(b) (Vernon 1987).

The legislature recently codified much of the law relating to exemplary damages. TEX. CIV.PRAC. & REM.CODE ANN. Chap. 41 (Vernon Supp.1996). However, the Chapter specifically excludes the Texas Debt Collection Statute. TEX.CIV.PRAC. & REM.CODE ANN. § 41.002(b)(6) (Vernon Supp.1996). There-fore, in this case, we are simply dealing with the evidence necessary to support a finding of punitive damages under the common law.

█ Waterfield argues that this requires a finding of malice, either actual or implied, on the part of the wrongdoer. They further say there is no evidence of malice on the part of Waterfield and therefore the exemplary damages must be reversed. We cannot agree that a finding of malice is the only foundation of exemplary damages in a Texas Debt Collections Act case. It is this court's opinion that malice can be the foundation of exemplary damages, but that it is not the only foundation. However, even if malice is necessary, there was evidence in this case to support such a finding.

The common law definition of exemplary damages in more modern times, and the one used by the Pattern Jury Charge comes from *Carnation Co. v. Borner*, 610 S.W.2d 450, 454 (Tex.1980).

> "Exemplary damages" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment.

4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 110.22 (1993).

The instructions for factors to consider are derived from *Lunsford v. Morris*, 746 S.W.2d 471 (Tex.1988); *Hofer v. Lavender*, 679 S.W.2d 470, 474 (Tex.1984); and *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). They include:

a. the nature of the wrong,

b. the character of the conduct involved,

c. the degree of culpability of the wrongdoer,

d. the situation and sensibilities of the parties concerned,

e. the extent to which such conduct offends a public sense of justice and properiety,

f. the net worth of the wrongdoer, and

g. compensation for inconvenience and attorney's fees.

4 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 110.22 (1993).

Waterfield cites the case of *Ware v. Paxton*, 359 S.W.2d 897 (Tex.1962) as an important case that defines the misconduct of a lending institution to support, or in that case, not to support exemplary damages. The Paxtons were charged usurious interest, and also, according to them, they were the victims of unreasonable collection methods. *Id.* at 901. The jury was given a definition of malice to support the giving of punitive damages and damages were awarded. *Id.* at 898–99. The Supreme Court, after reviewing the facts, disagreed and reversed. *Id.* at 902. The evidence included several dunning telephone calls and one unwelcomed personal visit by the lender over a two-year period. The court said this did not prove malice. However, the case never says that malice must always be the touchstone. Rather, the court dealt with the instruction and finding by the jury and found insufficient evidence to support the finding. *Id.*

Waterfield also cites the case of *Ledisco Fin. Serv., Inc. v. Viracola*, 533 S.W.2d 951 (Tex.Civ.App.—Texarkana 1976, no writ). Here, too, exemplary damages were awarded for unreasonable collection efforts and were later reversed. There were several telephone calls of an abusive nature and an employee of Ledisco went to the Viracola's home and hit Viracola in the chest with his clip board. *Id.* at 954. The case was reversed because there was no finding that the malicious acts of the employee were authorized, adopted or ratified by the corporation and therefore the corporation was not bound by the acts of the employee. *Id.* at 958.

Another case cited by Waterfield is *Bank of North America v. Bell*, 493 S.W.2d 633 (Tex.Civ.App–Houston [14th Dist.] 1973, no writ). This was also an unreasonable collection methods case in which the bank accelerated the loan and demanded full payment even before the first note was due. *Id.* at 635. In addition there were many abusive phone calls both to the debtor and his fiancee. Finally the bank also threatened criminal charges. *Id.* A jury finding of malice was upheld, but the exemplary damages were cut from $50,000 to $15,000 by remittitur. *Id.* at 637.

In cutting the exemplary damages, the court in *Bell* stated:

> In accordance with our best judgment this amount is the highest that could reasonably be allowed to stand taking into account the public policy of deterring the Bank and others from similar misconduct and considering those elements of damages that are permissible here but which would be too remote or intangible to be allowed as actual damages. In our view each case should stand on its own base. No case is exactly like another.

*Id.* The case also emphasizes "... we should respect the verdict of the finder of fact who had the opportunity to see and hear the parties and witnesses." *Id.* at 636.

Keeping in mind the above admonition, we turn to the trial court's findings, sitting as the fact-finder. The court found that the Rodriguezes made two unsuccessful attempts to meet their obligations. The first was only missed by $69.16 caused by late charges. The second was in the amount demanded by the defendants, but failed because the defendants decided by the time they received it that still more money was owed. The court found that by September 20, 1993, the Plaintiffs in good faith reasonably believed that they had satisfied the financial obligations requested by the Defendants. The court also found the Rodriguezes had not been given a specific date to have their money in, and before they found out that Waterfield had changed its demand, their house had been foreclosed on without their knowledge.

The court found this foreclosure unlawful and the Rodriguezes were evicted from their home before the trial court had an opportunity to decide whether the foreclosure should be set aside. By the time the trial court had an opportunity to rule, the home had already been sold, so the foreclosure could not be set aside as the damage was already done and irrevocable. The trial court also found that Waterfield had willfully proceeded with the justice of the peace foreclosure and eviction even though they knew of the Rodriguezes' claim in the trial court. The trial court was of the opinion that Waterfield's conduct was "egregious" and "wrongful."

After a careful review of the record, we find sufficient evidence to support each of the trial court's findings of fact. We believe that there was sufficient evidence to support the finding that the Rodriguezes were entitled to exemplary damages. Waterfield's cited cases where punitive damages have been awarded show personal abuse to the debtor of threats, phone calls and other actions meant to embarrass or intimidate. Waterfield points out that none of that was present in this case. We agree that these more common types of harassment were not present. But we also think that taking someone's home away from them when they are making good faith attempts to pay ever-escalating demands is worse than insulting or threatening them. Better harassed than homeless.

The trial court awarded exemplary damages that were double the actual damages, a two to one ratio. We find this reasonable and justified by the evidence and law. We affirm the exemplary damages.

## BONA FIDE ERROR

■ Waterfield's fifth and last point of error is that they are entitled to the defense of bona fide error under the Debt Collection Act. This provision states:

No person shall be guilty of a violation of this Act if the action complained of resulted from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

TEX.REV.CIV.STAT.ANN. art. 5069–11.08 (Vernon 1987).

■ We are unable to agree with this point of error. It was never raised before the trial court at any time and therefore is waived. TEX.R.APP. P. 52(a). We also do not see any evidence that would have supported this defense even if it had been raised. We acknowledge, of course, that issues may be tried by implied consent, even if the pleadings don't raise it. *Sage St. Assoc. v. Northdale Constr. Co.*, 863 S.W.2d 438, 444 (Tex. 1993). However, we have not only a pleading omission, but an evidentiary omission as well. As the defense was neither raised by the pleadings or the evidence we overrule it.

The judgment of the trial court is affirmed.

DUNCAN, Justice, concurring and dissenting.

I cannot agree either with the majority's characterization of the facts or with its judgment affirming the award of exemplary damages. Accordingly, I file this concurring and dissenting opinion.

### FACTS

On April 16, 1993, the Rodriguezes made their January, February, March, and April 1993 mortgage payments by a personal check drawn on their dance hall's account in the amount of $1512.04. They made no payments in May, June, or July. On July 21, Waterfield sent a letter advising the Rodriguezes that because of their poor payment history they would in the future be required to make their payments with certified funds.

In August 1993, the Rodriguezes sent Waterfield a personal check for $1468.00. At the time she sent the check, Doris Rodriguez knew she was required to and was not sending certified funds; she knew the check was for less than the amount due since it did not include the accrued late charges; and she knew there were insufficient funds in the account to cover the check, although she expected to make a deposit before the check was processed. When Waterfield received this check, it also noticed that it was a personal, rather than certified, check, and was for less than the amount due. Nonetheless, according to Viola Patterson, the Waterfield vice president in charge of the foreclosure department, Waterfield would have processed the check (and added the accrued but unpaid late charges to the Rodriguezes' next payment) if there were sufficient funds to cover it. However, when Waterfield called the bank, it learned that there were not sufficient funds in the account. Accordingly, Waterfield returned the check to the Rodriguezes on September 1. Neither Waterfield nor the Rodriguezes maintained a copy of the cover letter accompanying the check. According to Mrs. Rodriguez, the letter stated that the check was returned only because it was for less than the amount due.

On September 8, Waterfield referred the Rodriguezes' account to the foreclosure de-

partment which, on September 9, referred the account to its attorney. On September 13, 1993, Waterfield's attorney sent out a notice of acceleration. This notice, which stated that the Rodriguezes should contact Sandy Richardson at 219/434-8285 to determine "[t]he exact amount necessary ... to cure the existing defaults and prevent this foreclosure sale," was received by Daniel Rodriguez on September 15. Mrs. Rodriguez received her copy of the notice the following day and it was on that day, she testified, that she called not Sandy Richardson but Waterfield's toll-free number and got approval from "Sue" to overnight a cashier's check for $1537.16 to Waterfield on September 17. Although Waterfield makes computer entries documenting every customer call, its records do not reflect the call to which Doris testified. Nor does its file reflect that it sent its customary letter documenting the amount required to prevent foreclosure—an amount that could only be calculated after Waterfield determined the amount of attorney's fees thus far incurred in the foreclosure process.

On September 17, Mrs. Rodriguez sent a cashier's check to Waterfield for $1537.16. This check was received by Waterfield on September 20. On September 24, Waterfield returned the check with the following cover letter:

> Enclosed please find cashier's check # 117833 for $1,537.16. We received this in our office on September 20, 1993. This loan had foreclosure proceedings initiated on September 9, 1993. We can only accept the total amount due to reinstate the loan.
>
> I have tried to reach you by phone, but the number we have listed for your residence has been disconnected. I have enclosed reinstatement figures to bring the loan current. The foreclosure sale is set for October 5, 1993. We must have the reinstatement amount by October 4, 1993.
>
> If you need instructions on where to send the money or how to use Western Union or have any other questions, please contact our office at 219–434–8309.

Doris received this letter on October 12, after the foreclosure sale had already occurred.

According to Doris, her mail was sometimes delayed.

After the foreclosure sale, Waterfield filed a forcible entry and detainer action. In response, the Rodriguezes filed this suit, seeking actual and exemplary damages as well as a temporary restraining order to prevent eviction from their home. The trial court granted the temporary restraining order, giving the Rodriguezes sixty days to make the required payment and avoid eviction. However, when Mrs. Rodriguez tendered the amount due into the registry of the court on the last possible day, the district clerk refused the payment. The Rodriguezes did not request an extension of the TRO because they did not have the $1000 their attorney demanded to perform this service.

### DISCUSSION ·

### *Actual Damages, Attorney's Fees, and Interest*

Viewed in the light most favorable to the trial court's finding, Doris' testimony regarding her call to Waterfield on September 16 is some evidence and, in the circumstances, marginally sufficient evidence of a misrepresentation to support the trial court's finding and conclusion of a violation of the Texas Debt Collection Act. Accordingly, I concur in the majority's judgment affirming the award of actual damages, attorney's fees, and pre- and postjudgment interest.

### *Exemplary Damages*

The majority holds that malice is not required to recover exemplary damages for a violation of the Texas Debt Collection Act or, if it is, there is sufficient evidence to support the requisite malice finding. I disagree with both holdings.

In my view, malice—"ill will or bad or evil motive or *such gross indifference of the rights of another as will amount to a willful or wanton act done intentionally and without just cause or excuse*"—is required to support an award of exemplary damages for violation of the Texas Debt Collection Act. *See Ware v. Paxton,* 359 S.W.2d 897, 898 (Tex.1962) (emphasis added); *Ledisco Fin. Serv., Inc. v. Viracola,* 533 S.W.2d 951, 957–58 (Tex.Civ.App.—Texarkana 1976, no writ).

And if malice is required, there is simply no evidence of it in this record—whether in the form of a "campaign of harassment and intimidation," abusive language, threats, or an attempt to blacklist the Rodriguezes with their family, friends, or other creditors. *See Ware*, 359 S.W.2d at 899–902.

Moreover, even under a common law gross negligence standard, the Rodriguezes were required to prove:

> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994); *see also id.* at 20 (statute merely codified common law definition of gross negligence). And there is no evidence in this record that Waterfield acted with "conscious indifference" of the Rodriguezes' rights, nor is there any evidence to support the trial court's finding that Waterfield "wanted" the Rodriguezes to lose their home. To the contrary, the record is replete with instances in which Waterfield bent over backwards to avoid foreclosure. At best, Mrs. Rodriguez's testimony regarding her September 16 call demonstrates an isolated mistake by one employee as to the amount required to prevent the foreclosure.

### CONCLUSION

A mistake, even if unlawful, does not establish malice or gross negligence, and it does not justify an award of exemplary damages under either *Ware* or *Moriel.* Nor does pursuing one's legal rights, as Waterfield did in its forcible entry and detainer action. Accordingly, I dissent from the majority's judgment insofar as it affirms the trial court's exemplary damage award.