**EMC MORTGAGE CORPORATION,**
Appellant

v.

**Mark JONES and Patricia
S. Jones, Appellees.**

**No. 05–06–00419–CV.**

Court of Appeals of Texas,
Dallas.

May 7, 2008.

---

Deborah G. Hankinson, William Thompson, Law Offices of Deborah Hankinson, PC, Cole D. Patton, Dallas, for Appellant.

Jack B. Peacock, Jr., Gagnon & Peacock, P.C., Dallas, for Appellee.

Before Justices MORRIS, WHITTINGTON, RICHTER.

### OPINION ON REHEARING

Opinion by Justice RICHTER.

EMC's motion for rehearing is overruled. On the Court's own motion, we withdraw this court's opinion of August 29, 2007 and vacate the judgment of that date. This is now the opinion of the court. EMC Mortgage Corporation (EMC) challenges a jury verdict awarding Mark and Patricia Jones actual and punitive damages for violations of the Deceptive Trade Practices–Consumer Protection Act ("DTPA"), the Texas Debt Collection Practices Act ("DCPA"), common law unreasonable collection efforts, breach of escrow, and negligent misrepresentation. In ten issues, EMC contends there is no evidence to support the jury's liability and damage findings on these claims. EMC further asserts the trial court abused its discretion when it extended an agreed temporary injunction through appeal. We will vacate the portion of the judgment extending the temporary injunction, affirm in part, reverse and render in part, and remand in part.

### BACKGROUND

*Factual Background*

In July 2001, Mark and Patricia Jones purchased a home in Rockwall, Texas, and enjoyed a credit rating that allowed them to complete the purchase with no down payment. The $360,000 purchase price was financed in part with a thirty-year mortgage for $252,000 from the North American Mortgage Company. Because the Joneses desired to make certain improvements to the property, they also entered into a separate escrow agreement. The escrow agreement provided that $50,000 of the North American loan would be held in escrow for the construction of a swimming pool, a fence, and landscaping. Funds were to be disbursed from the escrow account upon the lender's receipt of written authorization from the Joneses. The remainder of the property's purchase price was financed with a second fifteen-year mortgage from International Bank of Commerce. The North American mortgage was subsequently transferred to Washington Mutual for servicing.

A little more than a year after the Joneses purchased their home, Mark Jones was laid off from his job as a pharmacist and was unemployed for several months. The Joneses fell behind on their mortgage payments and were in default under the terms of the first mortgage. By December 2002, Washington Mutual had scheduled a foreclosure sale for May 6, 2003.

The Joneses began working with the homeowner's assistance program at Washington Mutual. The parties agreed that if the Joneses would make three monthly payments that were higher than the regularly scheduled payment, Washington Mutual would then evaluate whether to enter into a loan modification agreement that would bring the mortgage current. Because of the potential loan modification, Washington Mutual directed that the May foreclosure sale be postponed until June 3, 2003.

The Joneses made the higher monthly payments, and Washington Mutual approved the loan modification. While the Joneses were waiting for Washington Mutual to send them the loan modification documents, they learned that the mortgage would be transferred to EMC.

Shortly after the mortgage was transferred, Mark Jones (Jones) contacted EMC to verify that the loan modification was in order. Jones spoke with Joanne

Jaime, an EMC employee. According to Jones, Jaime assured him EMC would honor the loan modification. Throughout the month of May, Jones waited for EMC to send the modification paperwork. He would contact Jaime periodically to check on the progress. Each time he called, Jaime assured him the paperwork was being processed and would be mailed soon.

On June 11, 2003, Jones contacted Jaime again. Once again, Jaime advised that everything was fine, and Jones should just be patient. Jones also testified that Jaime assured him that the June foreclosure date and all future foreclosure dates had been blocked.

The next evening, a "very large, intimidating man" appeared on the Joneses' doorstep, pounding on the front door. When Jones answered the door, the man stated he was there on behalf of EMC, and made his way into the foyer of the house. The large man began yelling and screaming, demanded the keys to the house, and told the Jones family to get out. When Jones told the man that there had been some mistake, the man told Jones that he no longer owned the house because it had been sold at a foreclosure sale. The man told the Jones family to immediately remove their furniture and possessions from the home, and threatened to throw it all on the front lawn if they did not comply.

After the large man left the Jones residence, Jones frantically attempted to contact Jaime. He left numerous voice mail messages that evening and throughout the next day. He also left voice mail messages for another EMC employee with whom he had spoken in the past. No one from EMC returned his calls. Jones never heard from Jaime again.

As of June 16, 2003, Jones had yet to hear from EMC, so he sent a letter to the president of EMC requesting an explanation. EMC responded by sending Jones the first in a series of form letters promising a response within sixty days. At some point in this time frame, the Joneses also received a letter from a law firm dated June 13, 2003, giving the Joneses three days to vacate the property or sign an agreed judgment.

When Jones was finally able to reach EMC by telephone, EMC admitted that a foreclosure sale had inadvertently occurred and should be rescinded. EMC assured Jones that it would take immediate action, and that the loan modification process would be completed. EMC's records also reflect that EMC informed Jones once again that the loan modification documents would be mailed to him. The promised documents were never sent.

When it was time for Jones to begin making payments under the yet unexecuted modification agreement, he had still not received any of the documentation from EMC. Nonetheless, Jones hand-delivered to EMC three cashier's checks for three monthly mortgage payments. The checks were drafted in the amount of the increased monthly payment that was to be required under the modified loan. Each month thereafter, Jones continued to hand-deliver the increased monthly mortgage payment to EMC.

By letter dated July 18, 2003, EMC advised Jones that the foreclosure sale had been rescinded as a result of Washington Mutual's approval of the loan modification. At the time of the letter, however, the sale had not actually been rescinded. EMC did not complete this process until October 20, 2003—four months after representing that it had been done. In the interim, EMC continued to report the account as a foreclosure on the Joneses credit report, and the property remained titled to EMC. Jones later learned that at the time EMC foreclosed on the property it had not received an assignment of the deed of trust from Washington Mutual.

When EMC foreclosed on the property, it also inadvertently sent a letter to the Joneses' insurance company, causing the cancellation of the hazard insurance on the property. Apparently failing to recognize that it caused the cancellation, EMC sent a letter to Jones stating that the new insurance policy had not been received, and threatened to put forced-placed insurance on the property. By the time EMC received a refund from the insurance company for the cancelled insurance, it had already acknowledged that the foreclosure had occurred in error. Nonetheless, the funds were not used to immediately reinstate coverage. Despite Jones urging that EMC return the funds to the insurance company to reinstate coverage, it took EMC six months to rectify this error. During this time, the Jones residence was without insurance coverage.

In addition, when EMC foreclosed on the property, it added the attorney's fees it incurred in foreclosure to the balance of the loan. Although Jones disputed the addition of this amount to the account balance, it remains part of the balance EMC claims to be due.

EMC was also presented with a judgment for $10,000 entered against the Joneses in favor of the company that constructed a fence on the property. It is undisputed that EMC paid the $10,000, releasing the funds from the escrow account without obtaining the Joneses' consent.

Jones continued to correspond with EMC, endeavoring to complete the loan modification and to address the difficulties resulting from EMC's foreclosure. On numerous occasions, EMC's only response was the sixty-day form letter. Each letter indicated that EMC was in the process of attempting to collect a debt.

EMC admits that until November 2003, the loan modification process was ongoing. The payments the Joneses were making, however, were not being applied to principal or interest on the loan. Instead, EMC held the funds in a suspense account, and reported the account as delinquent. No interest accrued on the funds held in this account, although interest continued to accrue on the mortgage loan.

In November 2003, Jones received a telephone call from an EMC employee, Michelle Barton. Jones testified that Barton yelled, screamed, and was generally rude, so he hung up on her. According to EMC's records, Barton advised Jones that he would need to obtain a subordination agreement from International Bank of Commerce (the second lien holder) before a loan modification could be completed. EMC's records further indicate that when the call concluded, Barton made a note in the file that Jones was uncooperative. She then terminated the loan modification process and sent the file to foreclosure. The property was scheduled for foreclosure in May 2004, and this lawsuit ensued.

*Procedural Background*

The Joneses initiated this lawsuit and included a claim for wrongful foreclosure. Consequently, the trial court signed a temporary restraining order enjoining EMC's foreclosure on the property. On May 14, 2004 the parties agreed to a temporary injunction. The agreed temporary injunction provided the injunctive relief would continue "until the trial set below is completed or otherwise ordered by the Court." The agreed temporary injunction also included the trial court's finding that the bond on file was sufficient.

The case was tried to a jury. The theories of recovery submitted to the jury included: violation of the DTPA and the DCPA, common law unreasonable collection efforts, breach of escrow, and negligent misrepresentation. The wrongful foreclosure claim was not submitted for the jury's determination, and the jury was

not asked whether EMC had the right to foreclose on the property.

The Joneses sought the recovery of actual damages for past and future mental anguish, past and future damage to their credit reputation, the reasonable value of the time spent attempting to correct the problems caused by EMC, and for breach of escrow. With the exception of the damages for breach of escrow, all of the actual damage questions were conditioned on an affirmative finding under any of the theories of liability.

The jury was also asked to find whether any of the harm to the Joneses resulted from malice or gross negligence and whether exemplary damages should be awarded. The exemplary damages question was only conditioned on an affirmative finding under one of two issues: negligent misrepresentation or common law unreasonable collection.

The jury returned a verdict with an affirmative finding on all liability questions and awarded actual damages, exemplary damages and additional damages under the DTPA. Prior to the entry of judgment, the Joneses were required to elect between the DTPA additional damages and the exemplary damages. The Joneses elected to receive the exemplary damage award.

The trial court entered a final judgment awarding the Joneses actual and exemplary damages and attorney's fees. The final judgment also included an order that "the Agreed Temporary Injunction entered by this Court on May 14, 2004 shall remain in effect until this judgment becomes final through appeal." The judgment did not award any permanent injunctive relief. This appeal followed.

## STANDARD OF REVIEW

■ Because EMC is attacking the legal sufficiency of the evidence on issues on which it did not have the burden of proof, EMC must demonstrate that there is no evidence to support the adverse findings. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Dallas County v. Holmes,* 62 S.W.3d 326, 329 (Tex.App.-Dallas 2001, no pet.). In reviewing a no evidence challenge, we consider the evidence "in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). We are not permitted to weigh the evidence or make credibility determinations. *See Cont'l Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996); *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). The jury's finding on an issue may be upheld on circumstantial evidence as long as it may be fairly and reasonably inferred from the facts. *Blount v. Bordens Inc.,* 910 S.W.2d 931, 933 (Tex.1995). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Continental Coffee,* 937 S.W.2d at 450. We apply this standard to all of EMC's no evidence issues except the challenge to the exemplary damages award. When reviewing a no-evidence challenge to exemplary damages, we utilize a heightened standard of review. *See In re J.F.C.,* 96 S.W.3d 256, 268 (Tex.2002).

■ The trial court's extension of the temporary injunction is reviewed under an abuse of discretion standard. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002). On an abuse of discretion challenge, we are not free to substitute our own judgment for the trial court's judgment. *Bowie Memorial Hospital v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). We can only find an abuse of discretion if the trial court "acts in an arbitrary or capricious manner without reference to any guiding rules or principles." *Bocquet v.*

*Herring,* 972 S.W.2d 19, 21 (Tex.1998). The court's decision must be "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 801 (Tex.2002).

## ANALYSIS

*The Temporary Injunction*

In its first issue, EMC asserts the trial court abused its discretion by extending the agreed temporary injunction past the final judgment. We agree.

An injunction is a remedial writ. *See Qwest Communications Corp. v. A.T. & T Corp.,* 24 S.W.3d 334, 336 (Tex. 2000). The purpose of a temporary injunction is to preserve the status quo pending a final disposition on the merits. *Matlock v. Data Processing Sec. Inc.,* 618 S.W.2d 327, 328 (Tex.1981). For this reason, a temporary injunction typically remains in force only until dissolved by interlocutory order or a trial court renders final judgment. *See Brines v. McIlhaney,* 596 S.W.2d 519 (Tex.1980); *Independent Am. Real Estate v. Davis,* 735 S.W.2d 256, 261 (Tex.App.-Dallas 1987, no writ); *Texas City v. Community Public Service Company,* 534 S.W.2d 412, 414 (Tex.Civ.App.-Beaumont 1976, writ ref'd n.r.e.).

Although the trial court may extend a temporary injunction after a final judgment in certain circumstances, those circumstances are not present here. *See Perry Bros. Inc. v. Perry,* 734 S.W.2d 211, 212 (Tex.App.-Dallas 1987, no writ). When initially issued, the agreed temporary injunction was based on a claim of wrongful foreclosure and the potential for immediate and irreparable injury in the event of a wrongful foreclosure. By the time of trial, however, the wrongful foreclosure claim had been abandoned, and there was no question put to the jury about EMC's right to foreclose on the property. There was nothing in the jury's findings that required the preservation of the status quo. There was no award of any permanent injunctive relief.

Once the final judgment was entered, the agreed temporary injunction should have terminated. *See G. Richard Goins Construction Co., Inc., v. S.B. McLaughlin Associates, Inc.,* 930 S.W.2d 124, 130 (Tex. App.-Tyler 1996, writ denied). In effect, by extending the temporary injunction, the trial court entered a new temporary injunction. But there was no basis for the entry of a new temporary injunction because the Joneses did not establish any of the requisite elements for injunctive relief. *See Greenpeace, Inc. v. Exxon Mobil Corp.,* 133 S.W.3d 804, 808 (Tex.App.-Dallas 2004, pet. denied).

For these reasons, we conclude the trial court abused its discretion when it extended the agreed temporary injunction beyond the final judgment. Appellant's first issue is sustained. The continuation of the agreed temporary injunction is void, and the portion of the judgment extending the temporary injunction is vacated.

*Damages for Breach of Escrow*

The jury affirmatively found EMC breached the escrow agreement and awarded actual damages in the amount of $10,000. EMC concedes it breached the escrow agreement when it disbursed the $10,000 without the Joneses' express authorization, but argues in its second issue that there is no evidence to support an award of damages and attorney's fees for the breach.

EMC attempts to minimize its actions by describing the payment of the escrow funds as a "technical breach." It asserts the Joneses were not damaged because the funds paid to the fence company satisfied an obligation the Joneses owed anyway. This argument lacks merit because it ignores the very purpose of an

escrow agreement and the essence of a breach of contract. An escrow agreement is a contract formed for the purpose of preserving funds so they will be available for disbursement when payment is authorized. *See Graco Robotics, Inc. v. Oaklawn Bank,* 914 S.W.2d 633 (Tex.App.-Texarkana 1995, writ dism'd). The escrow agreement expressly describes EMC's contractual obligation to preserve the funds until receipt of the Joneses' written authorization for payment. When EMC breached the escrow agreement by paying the $10,000 unauthorized claim, it resulted in a loss of the designated funds to which the Joneses were entitled. *See J.H. Lacy v. Ticor Title Insurance Company,* 794 S.W.2d 781 (Tex.App.-Dallas 1990) *writ denied,* 803 S.W.2d 265 (Tex.1991) (per curiam). Moreover, Jones testified that the judgment in favor of the fence company was not final and was in dispute.

■ The overall purpose of a damage award for a breach of contract is to compensate the injured party for the loss or damage actually sustained. *Qaddura v. Indo–European Foods, Inc.,* 141 S.W.3d 882, 888 (Tex.App.-Dallas 2004, pet.denied). On this record, we cannot say as a matter of law that there is no evidence to support the jury's award. The proof of the Joneses' loss of funds from the escrow account provides more than a scintilla of evidence to support the award of damages.

With respect to the award of attorney's fees, a party who prevails on a breach of contract claim is entitled to recover reasonable attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). EMC does not dispute whether the fees awarded were reasonable; it argues only that the award is not proper because there is insufficient evidence to support the dam-

ages awarded for the breach of escrow claim. Because we conclude there is sufficient evidence to support the damage award for breach of escrow, the award of attorney's fees is appropriate. EMC's second issue is overruled.

*Unreasonable Collection Efforts*

In its third issue, EMC asserts there is no evidence to support the jury's liability finding on the common law tort of unreasonable collection. Before we can measure the sufficiency of the evidence, we must first identify the standard against which the evidence is measured.

■ Unreasonable collection is an intentional tort. But the elements are not clearly defined and the conduct deemed to constitute an unreasonable collection effort varies from case to case. *See Pullins v. Credit Exchange of Dallas, Inc.,* 538 S.W.2d 681, 683 (Tex.Civ.App.-Waco 1976, no writ); *Household Credit Servs., Inc.v. Driscol,* 989 S.W.2d 72, 81 n. 3 (Tex.App.-El Paso 1998, writ denied); *Connell v. Rosales,* 419 S.W.2d 673, 676 (Tex.Civ.App.-Texarkana 1967, no writ); *Ware v. Paxton,* 359 S.W.2d 897, 899–902 (Tex. 1962); *see also,* Boe Martin, *A Creditor's Liability for Unreasonable Collection Efforts: The Evolution of a Tort in Texas,* 9 S. TEX. L.J. (1968) (discussing early evolution of the tort on a case-by-case basis). The method of submission of the issue to a jury is as varied as the conduct giving rise to the tort.[1] One of the more precise legal descriptions delineates the conduct giving rise to the tort as "efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm." *See Montgomery Ward & Co. v. Brewer,* 416 S.W.2d 837, 844 (Tex.Civ.App.-Waco 1967, writ

---

1. *Compare Household Servs., Inc.,* 989 S.W.2d at 81, n. 3 (submission as a form of negligence) with *Montgomery Ward & Co. v. Brewer,* 416 S.W.2d 837, 844 (Tex.Civ.App.-Waco 1967, writ ref'd n.r.e.) (submission with instruction defining level of intentional conduct required).

ref'd n.r.e.); *Rosales,* 419 S.W.2d at 676. Although EMC's sufficiency argument is based on this standard, EMC offers no explanation as to why we should measure sufficiency based upon the correct legal standard rather than by the charge that the jury was actually given. Here, the jury was simply asked: "Did EMC make any unreasonable efforts to collect the loan after the transfer to EMC from Washington Mutual?" No definitions or instructions accompanied this question. Neither party objected to the form in which this issue was submitted, and neither party has raised the issue on appeal. Accordingly, our inquiry does not involve the de novo standard of review that is applied when charge error has been asserted and preserved for review. *See e.g., St. Joseph Hospital v. Wolff,* 94 S.W.3d 513, 530 (Tex. 2002) (properly preserved charge error concerning an erroneous definition is a legal question subject to de novo review).

Although not directly on point, *Osterberg v. Peca,* 12 S.W.3d 31 (Tex.2000) is instructive to our review. In *Osterberg,* the Texas Supreme Court considered a challenge to a defective issue raised for the first time on appeal. The appellant argued the evidence should be measured against the question and instruction the court should have given. The Supreme Court rejected this argument, and held that when no objection is made to preserve the error for appeal, the sufficiency of the evidence is measured against the charge given by the court rather than some other unidentified law. *Id.* at 55; *see also, St. Joseph Hospital,* 94 S.W.3d at 530; *Southwestern Bell v. Garza,* 164 S.W.3d 607, 618 (Tex.2004) (court need not consider whether charge given without objection accurately states the law); *Wal–Mart Stores,*

*Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex. 2001) (sufficiency measured in light of the charge given without objection even though the charge did not accurately state the law); *Ancira Enterprises, Inc. v. Fischer,* 178 S.W.3d 82, 93 (Tex.App.-Austin 2005, no pet.) (applying definition of "malice" actually submitted to the jury rather than the stricter definition applicable in a retaliation suit).

 Here, there was no definition or instruction to place the term "unreasonable" in its proper legal context, and the question allowed the jury to determine whether EMC's collection efforts were unreasonable based on the common meaning of the word.[2] Although the question's lack of legal context renders meaningful appellate review difficult at best, *Osterberg* instructs that our review of this defective issue to which no one objected is limited to the charge the trial court submitted to the jury. *See Osterberg,* 12 S.W.3d at 55. We are also guided by the principle that if possible, we will interpret the jury's findings in a manner to uphold the judgment. *See Otis Spunkmeyer, Inc. v. Blakely,* 30 S.W.3d 678, 685 (Tex.App.–Dallas 2000, no pet.). We will therefore measure the sufficiency of the evidence of "unreasonable" collection efforts based on the commonly understood meaning used in the charge.

 The common, every day meaning of "unreasonable" is "exceeding the bounds of reason or moderation." WEBSTER'S INTERNATIONAL DICTIONARY 2507 (3rd Edition 1981). EMC argues the foreclosure was not an unreasonable collection effort because the mortgage was in default and it had a right to foreclose. EMC further argues the inadvertent foreclosure was not unreasonable because the issue was even-

---

2. In the boilerplate language of the charge, the jury was instructed "[w]hen words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning."

tually addressed. The right to collect the debt, however, is not the issue; it is the manner in which the right was exercised that the Joneses claimed was unreasonable. Similarly, the fact that certain errors were eventually corrected does not mitigate the length of time it took to correct the errors or the difficulty the Joneses experienced trying to have the errors corrected. The ultimate correction of the errors also does not excuse the compounding of the problems that resulted from untimely attention to the initial error. Although EMC may have been entitled to foreclose, it assured the Joneses the foreclosure had been postponed because of the pendency of the loan modification. After the foreclosure, it took EMC seven months to correct the title that was transferred when EMC initiated collection efforts by foreclosure.

The jury could also have concluded EMC did not act within the bounds of reason in its collection efforts based on the unexplained sequence of events surrounding the foreclosure. The evidence shows the foreclosure occurred on June 3, 2003. According to EMC, the foreclosure was an accident, and the law firm in charge of foreclosure had been instructed not to foreclose. But after the accidental foreclosure, EMC authorized a different law firm to send an eviction letter. The letter, which gives the Joneses three days to vacate the premises unless they signed an agreed judgment, was sent on June 13, 2003. There was no evidence to explain why EMC was taking affirmative action to evict the Joneses ten days after the foreclosure it concedes was in error and which it previously assured the Joneses had been postponed. Moreover, the only evidence that EMC had instructed the attorneys not to proceed with the June 3, 2003 foreclosure is a notation in the EMC files that was made on June 16, 2003.

We are equally unpersuaded by the argument that EMC's collection efforts were not unreasonable because the actions of the very large man cannot be conclusively attributed to EMC. EMC correctly asserts that the mere declarations of an alleged agent do not establish an agency relationship. EMC testified, however, that it contracts with third parties to handle the eviction process. It is undisputed that the law firm handling the foreclosure acted on behalf of EMC, as did the law firm that sent the eviction letter. EMC did not present evidence that the very large man did not exist, or that the man was not acting on its behalf. There was no evidence disputing Jones' testimony that the man actually appeared at the Jones residence. The EMC representative only testified that there was nothing written in EMC's records "showing that that person representing EMC appeared at the Jones' property." The very large man came to the Jones residence on June 12, 2003—a day before the letter from the law firm EMC hired to conduct the eviction. Thus, there was sufficient evidence for the jury to infer that the very large man acted on behalf of EMC, and that his conduct, as well as the conduct of EMC, exceeded the bounds of reason. On this record, within the confines of the charge that was given without objection, we conclude the evidence is sufficient to uphold the jury's finding of unreasonable collection efforts. EMC's third issue is overruled.

*Negligent Misrepresentation, the DCPA, and the DTPA*

 In its fourth, fifth, sixth, seventh, eighth, and ninth issues, EMC argues there is no evidence to support the jury's findings on the remaining liability issues submitted at trial. When the judgment rests on multiple theories of recovery, we need not address all causes of action if any one theory is valid. *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 634 (Tex.App.-

Waco 2000, pet.denied). Because we have concluded that the jury's finding of common law unreasonable collection efforts is supported by legally sufficient evidence and this finding is sufficient to sustain the verdict, we need not address Appellant's remaining liability issues.

In its tenth issue, EMC asserts that there is no evidence to support the jury's award of actual damages. EMC attacks the award of actual damages for mental anguish, damage to credit reputation, and the reasonable value of the time Jones spent attempting to correct the problems caused by EMC. We turn now to each of the categories under which the actual damages were awarded.

*Damages for Mental Anguish*

The jury awarded $5,000 to Mark Jones and $5,000 to Patricia Jones for mental anguish sustained in the past, and $2,000 each for mental anguish to be sustained in the future. EMC contends there is no evidence to support the jury's award of future mental anguish to Mark Jones, and no evidence to support the award of either past or future mental anguish to Patricia Jones. We agree.

■ Mental anguish is generally described as the emotional response of the plaintiff caused by the tortfeasor's conduct. *Birchfield v. Texarkana Mem. Hosp.,* 747 S.W.2d 361, 368 (Tex.1987). Because mental anguish is a "subjective non-pecuniary loss," it is not susceptible to precise calculation. *Household Credit Services, Inc. v. Driscol,* 989 S.W.2d 72, 90 (Tex.App.-El Paso 1998, pet. denied); *see also, Parkway Co. v. Woodruff,* 901 S.W.2d 434 (Tex. 1995). As a result, the amount of damages to which a party is entitled is left to the discretion of the jury. *Grogan v. Santos,* 617 S.W.2d 312, 315–16 (Tex.Civ.App.-Tyler 1981, no writ).

■ Recognizing the inherent dangers in the award of discretionary dam-

ages, Texas courts have restricted the types of injuries that rise to the level of mental anguish. Thus, a plaintiff must show a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Town East Ford Sales v. Gray,* 730 S.W.2d 796, 803 (Tex.App.-Dallas 1987, no writ); *Latham v. Castillo,* 972 S.W.2d 66, 70 (Tex.1998). To survive a legal sufficiency challenge, a plaintiff must present direct evidence of the nature, duration, and severity of his mental anguish which establishes a substantial disruption in his daily routine. *Parkway Co.,* 901 S.W.2d at 444; *Saenz v. Fidelity Guar. Ins. Underwriters,* 925 S.W.2d 607 (Tex.1996). If there is no direct evidence, we must apply traditional no evidence standards to determine whether the record reveals any evidence of the high degree of mental pain and distress that is required. *Latham,* 972 S.W.2d at 70; *Parkway Co.,* 901 S.W.2d at 444. With these principles in mind, we examine the mental anguish evidence in this case.

■ Mark Jones testified that he felt emasculated, embarrassed, depressed and afraid because of the situation with EMC. He did not feel as though he was able to perform his "masculine responsibilities," and a doctor put him on medication for depression. He was unable to sleep. Patricia Jones also testified that she had observed her husband suffering many of these difficulties. EMC did not challenge the jury's finding with regard to mental anguish suffered by Mark Jones in the past, so our review is limited to whether the evidence will support an award to Mark Jones for future mental anguish.

■ Testimony concerning mental anguish must provide specific details of the nature, duration, and severity of the mental anguish. *Gunn Infiniti, Inc. v. O'Byrne,* 996 S.W.2d 854, 861 (Tex.1999). There was no indication any of the difficul-

ties about which Jones testified will continue in the future. There is no testimony about whether he will be required to continue taking medication for depression. Indeed, there is nothing to establish the duration or the severity of the mental anguish anticipated in the future. As a result, there is no evidence to support the jury's award of $2,000 to Mark Jones for future mental anguish.

The evidence concerning Patricia Jones's mental anguish is also insufficient to support the jury's award. Patricia Jones offered no testimony about her own mental anguish. Her testimony was limited to observations about her husband. In fact, the only evidence of Patricia Jones' mental anguish is the testimony of her husband. When Mark Jones was asked how the situation with EMC had affected his wife Patricia, he stated "I think in much the same way ... I know it's taking a toll on her too." This testimony not only fails to provide details of the nature, duration, or severity of Patricia Jones' mental anguish, it is also conclusory. Conclusory statements are not sufficient to establish mental anguish. *See Gunn Infiniti, Inc.* 996 S.W.2d at 861. EMC's issue concerning the future mental anguish of Mark Jones and the past and future mental anguish of Patricia Jones is sustained.

*Damages for Lost Time*

EMC argues there is no evidence of damages for lost time. Jones testified that he spent 100–150 hours of his time attempting to correct his credit and loan problems, and that his time as a pharmacist was valued at $125–150 per hour. The jury awarded $3,600 in damages for loss of time. EMC argues that there is no evidence that 100–150 hours was a reasonable and necessary amount of time for Jones to spend to correct his credit problems. EMC also argues that Jones has offered no legal authority to support an award for lost time based on his rate of compensation as a pharmacist.

At trial, EMC objected to Jones' estimate of the number of hours he spent on the credit problem and stated that the value Jones assigned to the time was not relevant. Jones responded that the testimony was relevant because the jury was going to be asked to determine lost time damages, and the trial court allowed the testimony. EMC did not object to the inclusion of lost time damages in the jury charge. Thus, we are left to consider only whether there was any evidence of probative force to support the jury finding of $3,600 for lost time damages. We conclude there is more than a scintilla of evidence to support the damages awarded for lost time. We resolve EMC's issue against it.

*Damages for Loss of Credit*

EMC challenges the $5,000 awarded to the Joneses for the loss of credit reputation in the past, and the award of $10,000 for loss of credit reputation in the future. EMC contends Mark Jones's testimony does not meet the exacting test for the recovery of credit reputation damages. Loss of credit is recoverable as actual damages in a suit where damage to credit was the necessary and usual result of the defendant's actions. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 688 (Tex.1981). The amount of damages must only be established with the degree of certainty to which it is susceptible. *Southwestern Bell Tel. Co. v. Sims*, 615 S.W.2d 858, 864 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ). To recover actual damages for loss of credit reputation, a plaintiff must show that a loan was actually denied or a higher interest rate was charged. There must be a showing of injury, as well as proof of the amount of that injury. *St. Paul Surplus Lines Ins. Co., Inc., v. Dal–Worth Tank Co., Inc.,* 974

S.W.2d 51, 53 (Tex.1998); *Provident American Ins. Co. v. Castaneda,* 988 S.W.2d 189, 199 (Tex.1998).

Jones testified without objection that in early 2004, he tried to get the loan refinanced with another lender. The lender assured him that he could obtain at least a five percent interest rate on a refinanced loan. A week later, the lender contacted Jones and told him that he could not get a single lender to pick up the loan because of the foreclosure on the Joneses' credit report. At the time of trial, the 2003 foreclosure was still on Jones' credit report.

▅▅▅ Jones further testified without objection that under his loan with EMC at eight and a quarter percent interest, he would pay $363,951.28. Had he been able to obtain a loan at five percent interest, his payments would total $242,000.34 over the remaining life of the loan. As a result, Jones concluded that EMC's reporting of the foreclosure on his credit report would result in his having to pay an additional $163,000. The jury has discretion to award damages within the range of testimony presented at trial. *City of Houston v. Harris Co. Outdoor Advertising Ass'n,* 879 S.W.2d 322, 334 (Tex.App.-Houston [14th Dist.] 1994, writ denied). The evidence was admitted without objection. Therefore, we cannot conclude Jones failed to establish or quantify injury to his credit. EMC's issue is overruled.

*Exemplary Damages*

The jury awarded $125,000. in exemplary damages. In its eleventh issue, EMC insists there is no clear and convincing legally sufficient evidence to support this award. Based on a careful review of the record, we disagree.

▅▅▅ We have concluded there is legally sufficient evidence to uphold the jury's finding on unreasonable collection. Exemplary damages may be properly awarded for a violation of the common law

tort of unreasonable collection. *See Pullins v. Credit Exchange of Dallas, Inc.,* 538 S.W.2d 681 (Tex.Civ.App.-Waco 1976, no writ) (unreasonable collection efforts are an intentional tort); *Waterfield Mortg. Co. v. Rodriguez,* 929 S.W.2d 641, 647 (Tex. App.-San Antonio 1996, no writ). Exemplary damages must be proved by clear and convincing evidence that the harm suffered by plaintiffs resulted from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a) (Vernon 2006). "Clear and convincing evidence" is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(2) (Vernon 2006). "Clear and convincing evidence" is an intermediate burden of proof, less than "beyond reasonable doubt" but greater than the usual standard in civil cases of "preponderance of the evidence." *Foley v. Parlier,* 68 S.W.3d 870, 880 (Tex.App.-Fort Worth 2002, no pet.). As a result of this heightened burden of proof, the no evidence standard of review is correspondingly heightened. *Sw. Bell Tele. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004). The *Garza* court explained:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disre-

gard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

 Malice is defined as a specific intent to cause substantial injury or harm. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 2006). Gross negligence consists of both an objective and a subjective prong. Objectively, the conduct must involve an extreme risk of harm. Subjectively, the defendant must have an actual awareness of the risk, but nevertheless proceed in conscious indifference to the rights, welfare, or safety of others. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998). Malice need not be proved by direct evidence but may be inferred from other facts proved. *Corporate Wings, Inc. v. King*, 767 S.W.2d 485, 487 (Tex.App.-Dallas 1989, no writ).

 The jury was provided with the definitions of malice and gross negligence and instructed to consider the factors set forth in *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981)[3]. The jury was then asked to find, by clear and convincing evidence, whether the harm to the Joneses resulted from either malice or gross negli-

gence. The jury returned an affirmative finding. Therefore, the exemplary damages award will stand if there is clear and convincing evidence the unreasonable collection efforts resulted from either malice or gross negligence. We conclude the evidence was sufficient for the jury to reasonably form a firm belief that EMC's collection efforts were malicious.

The loan modification process, which according to EMC was perpetually on the verge of completion, dragged on for over seven months while EMC constantly assured the Joneses that the documentation would be mailed soon. Then, based on one telephone call that Jones described as abusive, Barton unilaterally deemed Jones "uncooperative," terminated the modification, and sent the file to foreclosure. But EMC did not inform the Joneses about this termination.

EMC contends the file was sent to foreclosure in November 2003 because Jones would not request a subordination agreement from the second lien holder. Nonetheless, EMC admitted it was aware of the second lien when the mortgage was transferred in May of 2003, and had no title opinion stating its title position would be impaired without a subordination agreement. Despite EMC's claim that the subordination agreement was a required component of the loan modification, EMC's records demonstrate that the Barton call to Jones in November of 2003 was the first time a subordination agreement was ever specifically mentioned to Jones. The EMC representative testified EMC has a policy of requiring a subordination agreement when there is a second lien. Despite this policy, the evidence shows the second lien holder contacted EMC about the

---

**3.** These factors include: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which the conduct offends a public sense of justice and propriety. *Alamo Nat'l Bank,* 616 S.W.2d at 910.

Jones file on at least two occasions prior to November 2003. During these conversations, EMC did not request or even mention a subordination agreement.

EMC insists the request for a subordination agreement does not evidence a specific intent to cause substantial harm to the Joneses because the Washington Mutual documents reflect the Joneses were informed EMC would honor the loan modification arrangements as long as there were no title issues. According to EMC, the existence of a second lien is a title issue. But EMC offered no explanation as to why the request for a subordination agreement was made in the proverbial eleventh hour of the process—after a conversation Jones described as abusive. Despite the constant interaction between EMC and Jones over the course of several months, there was no evidence that EMC ever mentioned a title issue. Prior to Barton's involvement, there is no reference to the existence of a title issue in EMC's files. Barton did not testify and EMC did not offer any evidence to contradict the inference that Barton's actions were vindictive and motivated by her heated exchange with Jones.

EMC admitted it has a policy of not foreclosing on a property when a loan modification is in progress and that this practice is customary in the industry. EMC also admitted the Jones mortgage was not handled in the customary manner and in accordance with EMC's policy. In its motion for rehearing, EMC contends we failed to consider and credit EMC for its efforts to minimize any injury to the Joneses resulting from the violation of EMC's general policy. But the affirmative steps taken to rescind the accidental foreclosure have nothing to do with Barton's subsequent intentional decision to send the file to foreclosure again. If anything, EMC's efforts following the accidental foreclosure underscore the peculiarity of

Barton's decision to disregard the general policy again. After Barton sent the file to foreclosure, there is no evidence EMC conducted any further analysis to determine if Barton's deviation from the general policy was warranted or the action was appropriate. Based on our review of all of the evidence, we conclude the evidence was sufficient for the jury to reasonably form a firm belief that Barton's collection efforts, manifested through the sudden invocation of EMC's policy and abrupt termination of the loan modification process was specifically intended to cause substantial harm to the Joneses.

■ EMC correctly states that a corporation may only be liable for exemplary damages if: (1) it commits malice through the actions or inactions of a vice-principal; or (2) the corporation ratifies an agent's gross negligence. *See Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998). EMC contends there was no pleading, proof, or jury finding that EMC acted maliciously through the actions or inactions of a vice-principal or ratified any malicious act.

■ With regard to EMC's assertion that there is no pleading to support ratification, our review of the record demonstrates otherwise. The first amended petition states "[w]henever ... it is alleged that a defendant did any act or thing, it is meant that the defendant itself, or its agents, officers, servants, employees or representatives did such act or thing, and it was done with the full authorization or **ratification** of defendant...." (Emphasis added). This was sufficient to put EMC on notice that the Joneses intended to prove EMC ratified Barton's malicious conduct.

■ Although the malice question was submitted to the jury without an instruction on ratification, neither party request-

ed an instruction. EMC failed to object to the manner in which the issue was submitted to the jury. As a result, any error resulting from a defect in the charge was not preserved for our review. See TEX.R. CIV. P. 272, 274; *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

Taken as a whole, the evidence is sufficient for a jury to reasonably form a firm belief or conviction that EMC acted with specific intent to cause the Joneses substantial harm. Because we conclude the evidence was sufficient to support a finding of malice, we need not consider whether the collection efforts also resulted from gross negligence. EMC's eleventh issue is resolved against it.

### CONCLUSION

We conclude there is sufficient evidence to support the liability and damage findings for unreasonable collection, damages for breach of escrow, and exemplary damages. Therefore, we need not reach Appellee's crosspoint requesting modification of the judgment if these theories are not upheld.

Accordingly, the judgment of the trial court is vacated as it relates to the temporary injunction. We reverse the trial court's judgment as it relates to past and future mental anguish for Patricia Jones and future mental anguish for Mark Jones and reduce the amount of the judgment for actual damages to $33,600.[4] The record does not reflect the dates the trial court used to calculate the award of prejudgment interest or the percentage rate used for the calculation. Therefore, we remand to the trial court to recalculate the award of prejudgment interest on all actual damages that are not future damages in accordance with this opinion. We affirm the trial court's judgment in all other respects.

---

4. The final judgment awarded actual damages of $42,600. We reduce this amount by $9,000; $2,000 for future mental anguish (Mark Jones), $2,000 for future mental anguish (Patricia Jones), and $5,000 for past mental anguish (Patricia Jones).