# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00055-CV

**Wallace Roofing, Inc. and Royce Dean Wallace, Appellants**

**v.**

**Linda Benson, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
NO. D-1-GN-09-002685, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant Wallace Roofing, Inc. (Wallace Roofing) brought suit against appellee Linda Benson (Benson) for breach of contract alleging she had failed to pay money owed on a contract for roofing and home repairs. Benson brought counterclaims under the Texas Debt Collection Practices Act (TDCPA), a tie-in statute to the Deceptive Trade Practices Act (DTPA), alleging that Wallace Roofing's unlawful debt collection practices had caused her mortgage company to cancel a closing on a loan to refinance the mortgage on her homestead. After a two-day bench trial, the trial court found in favor of Wallace Roofing on its breach of contract claim and awarded $255.77 in damages, but also found in favor of Benson on her counterclaims and awarded her $20,000 in damages and $25,000 in attorneys' fees. *See* Tex. Bus. & Com. Code §§ 17.01–17.926. Wallace Roofing appeals, contending: (1) there is insufficient evidence to support the trial court's damages award for either party; (2) there is insufficient evidence to support the trial court's finding that Wallace Roofing knowingly violated the DTPA; (3) the trial court erred in denying

its claim to foreclose on a constitutional lien against Benson's homestead; and (4) the trial court abused its discretion in denying Wallace Roofing's claim for attorneys' fees. We affirm the trial court's judgment.

## BACKGROUND

On June 14, 2005, Benson entered into a contract with Wallace Roofing to repair the roof on her home after an agent for the company visited her home unsolicited and obtained permission to inspect her roof for storm damage. The contract triggered an initial check from Benson's home insurer in the amount of $5,655.77. The check was made payable to Benson, but Benson testified that her insurer instructed her to deposit the check and then pay the sum to Wallace Roofing with personal checks as payments were due. Benson deposited the check, but Wallace Roofing did not contact her again until September, when a second agent for the company—Jeff Anthony—visited her home and informed her she would need to renegotiate her contract because the prior agent who had negotiated her contract was no longer with the company.

Benson signed a second contract with Wallace Roofing on September 1, 2005, which was executed by Jeff Anthony in his capacity as an authorized agent for Wallace Roofing. The second contract was written on the same pre-printed Wallace Roofing form as the first contract but contained additional work items for painting and repairing the gutters, deck, and window screens. In addition, the second contract contained a hand-written notation that Benson agreed to pay "per the claims adjustor agreement" and that the "contract is null and void unless insurance carrier pays 100% for all storm damage." Benson testified Anthony wrote the notations after she informed him she was unemployed and could not afford to pay her deductible, and he promised Wallace Roofing

2

would waive her deductible and she would not pay any out-of-pocket expenses. Benson additionally signed a form giving Wallace Roofing the authority to directly negotiate with her insurance carrier.

After Benson signed the second contract, her home insurer issued two additional checks for her claim in the amounts of $9,012.60 and $2,349.33. In total, including its initial payment to Benson for $5,655.77, Benson's home insurer paid $17,017.70 for the claim.[1] With regard to the last two insurance checks, it is undisputed that these checks were made payable to and deposited by Wallace Roofing. In dispute, however, was whether Benson paid Wallace Roofing the $5,655.77 from the initial insurance check and whether she owes Wallace Roofing the additional $3,300, i.e., the amount of the deductible under her policy.

1. **Payments Made by Benson**

With regard to the initial insurance check for $5,655.77 deposited by Benson, both parties agree she paid from that check the following contract-related expenses: (1) a personal check Benson wrote to Wallace Roofing in the amount of $3,500; and (2) $300 spent by Benson for supplies and other contract expenses. The parties, however, disagreed at trial as to whether Benson should receive credit for two personal checks in the amounts of $1,300 and $300 which she made payable to Wallace Roofing's agent, Jeff Anthony, with the notation "roofing." According to Benson, Anthony presented her with invoices for the roofing repairs, requested that she make the checks payable to him personally, and presented her with a hand-written receipt reflecting the

---

[1] Although Benson entered into two contracts with Wallace Roofing, no work was performed under the first contract and her insurer processed the work as a single claim. Insurance records show that the initial payment received and deposited by Benson was for work performed by Wallace Roofing under the second contract.

3

payments. Wallace Roofing denied ever receiving the receipt or checks but admitted at trial that it was aware Anthony had collected and failed to turn over payments from other clients.

**2.      Notice of Outstanding Debt**

The parties also dispute whether Wallace Roofing gave Benson notice of any remaining debt under the contract. In December 2005, Royce Dean Wallace (Wallace), the president and manager of Wallace Roofing, visited Benson's home after the roof work was complete. Benson testified that during this meeting she gave Wallace a copy of the receipt showing she had paid $1,600 directly to Anthony for roofing expenses. According to Benson, Wallace acknowledged the payments and made no demand for further payment. Wallace, on the other hand, testified that Benson did inform him she had already paid Anthony $5,400 on the account but did not provide him with the receipt or inform him the checks had been made payable to Anthony personally.

In February 2006, Wallace again visited Benson's home. According to Benson, Wallace asked her for the last insurance check during this visit and then left without asking for further payment. Wallace testified that he did ask for the insurance check, but also asked Benson to pay the remaining balance on her account. Wallace did not testify as to the amount of money he demanded from Benson during this exchange.

In March 2006, a Wallace Roofing employee contacted Benson asking her to submit an affidavit stating that she had written personal checks to Jeff Anthony for roofing repairs made by Wallace Roofing. Benson testified that the secretary informed her the company needed the affidavit to collect the money from Anthony. Benson testified that she signed the affidavit and promptly sent it to Wallace Roofing. Wallace Roofing, however, claims to have no record of receiving the affidavit.

4

The following month, on April 20, 2006, Wallace Roofing mailed Benson a demand letter sent certified mail, return receipt requested. The letter, however, was returned to Wallace Roofing as "unclaimed," and Benson denied receipt of the letter. The demand letter claimed that Benson had a remaining balance on her account of $5,220.10. While there is dispute between the parties as to the amount Benson owed on her contract, Wallace Roofing concedes that it miscalculated the amount due in the demand letter by failing to credit Benson's account with the final payment it had received from her insurer in the amount of $2,349.33. The demand letter also did not credit Benson's account with the $1,600 she had paid directly to Anthony.

On June 16, 2009, after taking no action on the account for more than three years, Wallace Roofing filed a statutory mechanic's lien against Benson's homestead for $5,220.10. At trial, Wallace Roofing admitted that the lien was filed past the statute of limitations and without notice to Benson. Wallace Roofing also admitted at trial that—at the time it filed the lien—it had in its possession documents showing that it had failed to credit Benson's account with the $2,349.33 insurance check it had received. Wallace Roofing's lien also did not credit Benson's account with the $1,600 she had paid directly to Anthony.

3.      **Wallace Roofing's Lawsuit and Benson's Failed Refinance**

On August 18, 2009, Wallace Roofing filed suit against Benson for breach of contract seeking $5,220.10 in damages. Wallace Roofing did not serve Benson with the suit. Unbeknownst to Wallace Roofing, that same week, on August 20, 2009, Benson was scheduled to close on a loan to refinance the existing mortgage on her homestead. Benson testified that the first time she learned of any claim of outstanding debt to Wallace Roofing was an hour before her closing when the mortgage company informed her that Wallace Roofing had placed a lien on the property that

5

would prevent the refinance. The loan officer for the refinance testified the sole reason the closing was canceled was because Wallace Roofing had filed a lien against the property. After learning of the canceled closing, Benson testified that she immediately contacted Wallace Roofing and was informed by Wallace Roofing's attorney that she would have to pay $5,220.10 to settle her account and release the lien. Benson refused to pay, but after being contacted by Benson's attorney, Wallace Roofing agreed to release the statutory mechanic's lien. After Wallace Roofing released the statutory mechanic's lien, the mortgage company agreed to move forward with the refinance and rescheduled the closing.

After releasing the lien, however, Wallace Roofing immediately amended their pleadings to add a constitutional lien claim against Benson's homestead, and on the following day—August 21, 2009—Wallace Roofing's attorney forwarded the amended pleading and a notice of lis pendens to the title company.[2] That same day Benson was traveling to her second scheduled closing when the mortgage company contacted her to cancel. According to Benson, the mortgage company informed her they would not be able to refinance her home because of the Wallace Roofing lawsuit and the constitutional lien claim. The loan officer for the refinance testified that the sole reason the refinance did not occur was because Wallace Roofing had filed the lawsuit against Benson. The loan officer, however, was not aware of the specific claims at

---

[2] In its findings of fact, the trial court found that Wallace Roofing sent the title company a copy of the suit and notice of a *statutory mechanic's lien* against Benson's homestead. Wallace Roofing complains in its third issue on appeal that it actually sent notice of its *constitutional lien claim* and not a statutory mechanic's lien. We agree. The record shows that at the time Wallace Roofing sent the lis pendens, it had already released its statutory mechanic's lien against Benson and sent the lis pendens to provide notice of its newly-asserted constitutional lien claim.

issue in the Wallace Roofing suit and acknowledged that any lawsuit in which Benson was the defendant—whether it was related to the property or not—could have prevented the refinance.

After the second closing was canceled, Benson brought counterclaims against Wallace Roofing alleging it knowingly violated the TDCPA, a tie-in statute to the DTPA, by misrepresenting the amount of her debt and using false representations and deceptive means to collect a debt.[3] *See* Tex. Fin. Code §§ 392.304(a)(8),(19) (TDCPA causes of action), 392.404(a) (violation of TDCPA is deceptive trade practice actionable as DTPA violation). At trial, Benson's damages evidence rested primarily on her failed refinance. Benson testified that she had twelve years and ten months remaining on her thirty-year mortgage and that her monthly payment was $1,305.13. If Benson had been able to refinance, according to the good faith estimate, she would have reduced her monthly payment to $715.61 and changed the length of her loan to fifteen years. Accordingly, the total payment remaining on her thirty-year mortgage was $200,990.02 (154 monthly payments x $1,305.13), but the refinance would have reduced her total payment to $128,809.80 (180 months x $715.61). Benson further testified that she was hysterical after the mortgage company canceled her refinance and had seen a doctor for stress and insomnia. She testified extensively as to her financial troubles and how the refinance would have significantly relieved her financial pressure by reducing her monthly mortgage payment. The loan officer testified that Benson had subsequently attempted to apply for another refinance loan but did not qualify because of new stricter lending guidelines.

---

[3] Benson also alleged claims under section 392.301 of the Finance Code. *See* Tex. Fin. Code § 392.301(a)(3),(8) (prohibiting debt collector from representing to any person that a consumer is willfully refusing to pay a nondisputed debt when consumer has notified debt collector in writing that debt is disputed and from threatening to take an action prohibited by law). These claims were dismissed on summary judgment.

**4.**     **Judgment**

The trial court ruled in favor of Wallace Roofing on its breach of contract claim but awarded only $255.77 in damages and no attorneys' fees. In calculating the amount of damages, the trial court impliedly found that Benson's account should be credited with payments she made to Anthony and that she was not required under the contract to pay Wallace Roofing the amount of her deductible. For Benson's DTPA counterclaims, the trial court found in her favor and awarded her $15,000 in actual damages, $5,000 in emotional damages, and $25,000 in attorneys' fees for trial and appeal of the case. In its findings of fact, the trial court found that Wallace Roofing failed to provide Benson notice of its claim, misrepresented the amount of debt owed, and that the scheduled closing on Benson's refinance was canceled due to the actions of Wallace Roofing.

## DISCUSSION

### *Damages for Failed Refinance*

**1.**     **Standard of Review**

It its first and second issues on appeal, Wallace Roofing contends there is no evidence or insufficient evidence that it committed any DTPA violation that caused Benson's refinance to fail, and therefore, it is not liable for any amount of damages resulting from the failed refinance. Because Wallace Roofing attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate on appeal that there is no evidence to support the finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). "When reviewing a no-evidence point, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary." *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002). "Anything

8

more than a scintilla of evidence is legally sufficient to support the finding." *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

In reviewing Wallace Roofing's factual sufficiency challenge to the trial court's findings, we must examine the entire record to determine if there is some probative evidence to support the finding, and, if there is, we must determine whether the evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 201 (Tex. App.—Austin 2005, pet. denied); *see also Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, pet. denied). We may not reverse merely because we conclude that the evidence preponderates toward a different answer. *McMillin*, 180 S.W.3d at 201.

**2.      Were Wallace Roofing's DTPA violations a producing cause of Benson's failed refinance?**

The DTPA allows a plaintiff who prevails on a violation based on a tie-in statute to prove and recover any actual damages she suffers. *See* Tex. Bus. & Com. Code § 17.50(h). Damages resulting from a refinance may be compensable as actual damages. *See, e.g.*, *Smith v. Santander Consumer USA, Inc.*, 703 F.3d 316, 318 (5th Cir. 2012) (sufficient evidence to support actual damages award when consumer suffered increased interest rate on refinance resulting from consumer finance company's erroneous credit rating report); *K & N Builder Sales, Inc. v. Baldwin*, No. 14-12-00012-CV, 2013 WL 1279292, *7 (Tex. App.—Houston [14th Dist.] March 28, 2013, pet. denied) (mem. op.) (sufficient evidence to support actual damages award for failed refinance when plaintiff's testimony demonstrated the loss of a specific, applied-for mortgage transaction that

9

was defeated by discovery of defendant's invalid lien); *compare Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 29–30 (Tex. App.—Tyler 2000, pet. denied) (jury's failure to find refinance damages for DTPA violations upheld when plaintiff failed to prove interest rates on current mortgage and refinance).

In this case, there is sufficient evidence to support the trial court's findings that Benson's refinance was canceled due to the actions of Wallace Roofing and that Benson suffered damages. It is undisputed that Benson had applied and been approved for a specific refinance loan, the loan would have significantly reduced Benson's mortgage payments, she was unable to qualify for another refinance loan because of new stricter lending guidelines, and the "sole reason" the refinance was canceled was because of Wallace Roofing's lawsuit and lien claims against Benson's homestead.

In order to prevail on a DTPA claim, however, a party must establish that a defendant's specific DTPA violation was a producing cause of the claimant's injury. *See* Tex. Bus. & Com. Code § 17.50(a) (to recover damages under DTPA, deceptive trade practice must be a producing cause of consumer's damages); *see also Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). To establish producing cause, the plaintiff must show the defendant's DTPA violations were: (1) a substantial factor in bringing about the injury, and (2) a cause-in-fact of the plaintiff's injuries, such that the injury would not have occurred but for the defendant's acts or omissions. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). It is not necessary to show that an injury was foreseeable to establish producing cause. *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 481.

In this suit, Benson brought two DTPA claims against Wallace Roofing for violations of the TDCPA: (1) misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer's debt status in a judicial or governmental proceeding; and (2) using any other false representation or deceptive means to collect a debt. *See* Tex. Fin. Code § 392.304(a)(8), (19). The trial court found in favor of Benson on all DTPA claims and awarded damages, but did not make an express finding that Wallace Roofing's DTPA violations were the producing cause of Benson's damages. As producing cause is an essential element for recovery on a DTPA claim, the finding is implied. *See Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 252 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("When a court makes findings of fact, but inadvertently omits an essential element of a ground of recovery or defense, the presumption of validity will supply the omitted element by implication."). Accordingly, we may set aside the judgment only if: (1) there is no evidence that supports the trial court's implied finding that one or both of Wallace Roofing's DTPA violations were a producing cause of Benson's damages, (2) or if the evidence supporting the finding is so weak that it is clearly wrong and manifestly unjust. *See McMillin*, 180 S.W.3d at 201.

With regard to her first claim—that Wallace Roofing misrepresented the amount of her debt—Wallace Roofing concedes that it misrepresented the amount of Benson's debt to her mortgage company but argues that there is no evidence in the record that the amount of Benson's debt was a substantial factor in the mortgage company's decision to cancel her refinance. Wallace Roofing bases this argument on the testimony of the loan officer handling the refinance, who acknowledged that "any lawsuit in which [Benson] was the defendant . . . [could] have prevented the refinance."

11

On this record, however, there is sufficient evidence that Wallace Roofing's liens and lawsuit misrepresented the amount of debt owed, and that this discrepancy as to the amount of Benson's debt—as well as Wallace Roofing's failure to give notice—were substantial factors in Benson's refusal to pay, which in turn resulted in Wallace Roofing's lawsuit and her failed refinance. *See Ledesma*, 242 S.W.3d at 45 (there can be more than one producing cause of an injury). Benson testified that at the time of the refinance she had a negative balance in her checkbook and could not pay Wallace Roofing the $5,220.10 demanded. She testified, however, that if Wallace Roofing had demanded $1,000 instead, she could have borrowed that amount of money from her mother. As the trial court found that Benson owed only $255.77 on her contract, we conclude there is sufficient evidence that Wallace Roofing's misrepresentation of the amount of Benson's debt was a substantial factor and cause-in-fact of her failed refinance.

With regard to Benson's second claim—that Wallace Roofing employed a false representation or deceptive means to collect a debt—the trial court found that Wallace Roofing failed to notify Benson of any outstanding debt on her account before filing, approximately three-and-a-half years after completing its repairs, a statutory mechanic's lien against Benson's homestead that Wallace Roofing admits was invalid. Upon discovery of the invalid lien, Benson's mortgage company canceled her first scheduled closing on her refinance. As Benson's refinance would have closed but for the invalid lien placed on Benson's homestead without notice to her, we conclude there is also sufficient evidence that the invalid lien and Wallace Roofing's failure to give Benson notice of the claim were also substantial factors and causes-in-fact of her failed refinance. *See K & N Builder Sales, Inc.*, 2013 WL 1279292, at *7 (upholding damages award for failed refinance when mortgage transaction was defeated by bank's discovery of defendant's invalid lien).

12

Having found sufficient evidence to support the trial court's implied finding that Wallace Roofing's DTPA violations were a producing cause of Benson's damages, we cannot conclude the evidence supporting this finding is so weak or contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. We overrule Wallace Roofing's first and second issues on appeal.

### Knowing DTPA Violation

In its fourth and fifth issues on appeal, Wallace Roofing contends there is insufficient evidence to support the trial court's finding that it knowingly violated the TDCPA's prohibition on misrepresenting the character, extent, or amount of a consumer debt or misrepresenting the consumer's debt status in a judicial or governmental proceeding. *See* Tex. Fin. Code § 392.304(a)(8). Because Wallace Roofing attacks the legal and factual sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate on appeal that there is no or insufficient evidence to support the finding. *See McMillin*, 180 S.W.3d at 201.

The DTPA provides additional damages for statutory violations that are committed "knowingly." *See* Tex. Bus. & Com. Code § 17.50(b)(1). The DTPA defines "knowingly" as "actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim . . . but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." *Id.* § 17.45(9). Here, Wallace Roofing represented in its statutory mechanic's lien and pleadings that Benson owed $5,220.10 on her roofing contract, but admitted at trial that this amount was incorrect because it had in its possession—at the time it filed the lien and lawsuit—documents showing that it had failed to credit Benson's account with a $2,349.33 payment from her insurer.

13

Thus, there is sufficient evidence supporting the trial court's finding that Wallace Roofing knowingly misrepresented the amount of Benson's debt.

On appeal, however, Wallace Roofing contends that the trial court erred in finding that it knowingly misrepresented the amount of Benson's debt because the evidence showed that any violation was unintentional and the result of "bona fide error." The TDCPA provides a defense for debt collectors accused of statutory violations upon proof that the "violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably calculated to avoid such error." Tex. Fin. Code § 392.401. Wallace Roofing, however, had the burden of pleading and proving bona fide error as a defense. *Waterfield Mortg. Co., Inc. v. Rodriguez*, 929 S.W.2d 641, 647 (Tex. App.—San Antonio 1996, no writ); *Crawford Chevrolet, Inc. v. McLarty*, 519 S.W.2d 656, 662 (Tex. Civ. App.—Amarillo 1975, no writ). Because Wallace Roofing failed to plead bona fide error as a defense, it has waived its right to assert this defense on appeal. *Waterfield Mortgage Co., Inc.*, 929 S.W.2d at 647; *Crawford Chevrolet, Inc.*, 519 S.W.2d at 662. Further, we cannot conclude that the issue was tried by implied consent as the trial court excluded evidence relevant to the defense after Wallace Roofing advised that it was not asserting bona fide error as a defense. *See Waterfield Mortgage Co., Inc.*, 929 S.W.2d at 647. Accordingly, we conclude Wallace Roofing failed to plead and prove the defense of bona fide error and has waived this issue on appeal. We overrule Wallace Roofing's fourth and fifth issues on appeal.

### Wallace Roofing's Damages

In its sixth issue on appeal, Wallace Roofing contends it proved as a matter of law it was entitled to $1,855.77 in damages for its breach of contract claim and that there is insufficient evidence to support the trial court's award of only $255.77 in damages.

**1.       Contract Price**

Our first task in addressing this issue is to construe the roofing contract to determine what payment the parties agreed Wallace Roofing would receive under the contract. The contract provided that, upon completion of the repairs, Benson would pay Wallace Roofing "per the claims adjuster agreement." The term "claims adjuster agreement" is not defined in the contract. The contract additionally contained a hand-written notation stating: "This contract is null and void unless insurance carrier pays 100% for all storm damage." The trial court construed the contract as requiring Benson to pay $17,017.70, the amount paid and approved by Benson's insurer for the claim. Wallace Roofing, however, contends this is an incorrect interpretation of the contract and argues the contract required Benson to pay Wallace Roofing an additional $3,300, which was the amount of Benson's deductible under her homeowner's insurance policy.[4] The construction of an unambiguous contract is a question of law which we review de novo. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

In determining which price governs the contract, we must ascertain and give effect to the parties' intentions as expressed in the contract. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*,

---

[4] Benson testified that Wallace Roofing's agent promised to waive her deductible and accept the insurance company's payment as full satisfaction for the entire claim. Although the Texas Attorney General has found this practice does not constitute insurance fraud, the legality of such an agreement is less than clear under Texas law. *See* Tex. Att'y Gen. Op. No. JM-1154 (1990) ("A situation in which a person providing a good or service does not seek payment from an insured of the amount of his insurance deductible does not constitute a criminal offense."); *but see also* Tex. Bus. & Com. Code § 27.02 ("A person who sells goods or services commits insurance fraud if the person advertises or promises to pay all or part of any applicable insurance deductible or a rebate in an amount equal to all or part of any applicable insurance deductible."); Tex. Penal Code § 35.02(b) ("A person commits an offense if, with intent to defraud or deceive an insurer, the person solicits, offers, pays, or receives a benefit in connection with the furnishing of goods or services for which a claim for payment is submitted under an insurance policy."). As this issue was not raised or briefed by the parties, we express no opinion as to the legality of such an agreement.

15

165 S.W.3d 310, 311–12 (Tex. 2005). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999); *see Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006).

Although the parties have conflicting interpretations of the contract, we look to their objective intent as manifested in the words of their written agreement and will consider the parties' interpretations and extraneous evidence only if the contract is ambiguous. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008); *see also Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981). "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." *Frost Nat'l Bank*, 165 S.W.3d at 312. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to two or more reasonable interpretations. *DeWitt Cnty. Elec. Coop., Inc.*, 1 S.W.3d at 100.

Returning to the contract, we conclude as a matter of law that the unambiguous terms of the agreement required Benson to pay Wallace Roofing $17,017.70, the sum approved and paid by her insurer for the claim. The contract provides that Wallace Roofing is to be paid "per the claims adjustor agreement" and that the contract is "null and void" unless Benson's insurance carrier agrees

16

to "pay 100% for all storm damage." Applying the plain meaning of these terms, we conclude that Benson has no liability under the contract except for those sums paid by her insurer for the claim based on the claims adjustor's assessment of damages. *See id.* at 101 (language in agreement to be given plain grammatical meaning). Interpreting the contract as requiring Benson to additionally pay for her deductible would nullify the provision requiring her insurer to pay 100% for all storm damage and render the contract null and void. *See Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) ("If a contract is susceptible of two constructions, one of which would render it valid and the other invalid, construction validating it must prevail."); *Burnett Ranches, Ltd. v. Cano Petroleum, Inc.*, 289 S.W.3d 862, 867 (Tex. App.—Amarillo 2009, pet. denied) ("[W]e generally cannot interpret one contractual provision in a way that nullifies another."). Accordingly, we conclude as a matter of law Wallace Roofing was entitled to $17,017.70 under the contract.

## 2. Payments Made to Wallace Roofing's Agent

After determining the amount due to Wallace Roofing under the contract, our next task is to determine whether there is sufficient evidence to support the trial court's implied finding that payments Benson made to Wallace Roofing's agent, Jeff Anthony, should be offset against the amount Benson owed Wallace Roofing. When an agent has either actual or apparent authority to receive payments due on a contract, payment to the agent has the same legal effect as payment to the principal itself. *See McAlpin v. Ziller*, 17 Tex. 508, 514 (Tex. 1856); *see also Pfluger v. Colquitt*, 620 S.W.2d 739, 743 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.). If an authorized agent subsequently misappropriates the money for his own use, the damages resulting from the agent's actions must be borne by the principal. *Cash v. Lebowitz*, 734 S.W.2d 396, 399 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *Pfluger*, 620 S.W.2d at 743. The mere fact that an agent is authorized to

17

contract on behalf of its principal, however, does not necessarily imply that the agent has actual or apparent authority to receive payment under the contract. *See Gunter v. Robinson*, 112 S.W. 134, 135 (Tex. Civ. App.—Dallas 1908, no writ). Here, the trial court found that Benson owed Wallace Roofing only $255.77 in damages. In calculating the amount of damages, the trial court impliedly found that Anthony was acting within the scope of his actual or apparent authority when he received Benson's payments, and therefore, the payments should be offset against Wallace Roofing's damages.

On appeal, Wallace Roofing challenges this implied finding contending there is no or insufficient evidence that Anthony was within the scope of his authority when he received Benson's payments. At trial, Benson had the burden of proving that Anthony was acting within the scope of his authority when he accepted her payments for work performed by Wallace Roofing. *See Boucher v. City Paint & Supply, Inc.*, 398 S.W.2d 352, 356 (Tex. Civ. App.—Tyler 1966, no writ) (burden of proof on party seeking to establish agency). Accordingly, for its legal sufficiency challenge, Wallace Roofing must demonstrate on appeal that there is no evidence to support the trial court's implied finding that Anthony had either actual or apparent authority to receive payments from Benson on behalf of Wallace Roofing. *See Croucher*, 660 S.W.2d at 58. In reviewing a no evidence challenge, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor, and disregarding all contrary evidence and inferences unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. For Wallace Roofing's challenge to the factual sufficiency of the evidence supporting the finding, we must consider and weigh all the evidence and set aside the

18

judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *HealthTronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 581 (Tex. App.—Austin 2012, no pet.).

### A. Scope of Agent's Actual or Apparent Authority

Actual authority denotes that authority that a principal intentionally confers upon an agent, intentionally allows the agent to believe he possesses, or allows the agent to believe he possesses by want of due care. *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no writ). Apparent authority, however, arises "either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise." *Gaines v. Kelly*, 235 S.W.3d 179,183 (Tex. 2007); *see also Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984). To determine an agent's apparent authority, we examine the conduct of the principal, reliance by the party alleging apparent authority, and the reasonableness of the third party's assumptions regarding the agency's authority. *Gaines*, 235 S.W.3d at 183; *see also Ames*, 672 S.W.2d at 450. Declarations of the alleged agent, without more, are incompetent to establish either the existence of the agency or the scope of the alleged agent's authority. *Gaines*, 235 S.W.3d at 183.

### B. Sufficient Evidence of Anthony's Authority

On this record, we conclude there is sufficient evidence to support the trial court's implied finding that Anthony was acting within the scope of his actual or apparent authority when

he received payments from Benson for work performed by Wallace Roofing. The record shows Benson wrote two checks to Anthony with the notation "roofing" and had obtained a receipt reflecting that the payments were for work performed by Wallace Roofing. Further, the president of Wallace Roofing admitted at trial that Anthony was Wallace Roofing's agent and was authorized to contract with Benson on behalf of the company. This was also reflected in Wallace Roofing's contract, which represented that Anthony was an "authorized agent" for Wallace Roofing. Moreover, Wallace Roofing's contract did not prescribe a particular method of payment or otherwise limit Anthony's authority to collect payments under the contract. Further, the president of Wallace Roofing acknowledged at trial that he had asked Benson to sign an affidavit averring that she had made payments to Anthony directly so that Wallace Roofing could attempt to recover those sums from Anthony. The president of Wallace Roofing further testified that if he had been able to verify the $1,600 in payments Benson made to Anthony, he would have credited her account for the payments. Reviewing the evidence in the light most favorable to the judgment, we conclude there is more than a scintilla of evidence to support the trial court's implied finding that Anthony had either actual or apparent authority to receive payments from Benson on behalf of Wallace Roofing.

Although the president of Wallace Roofing testified that he had not given Anthony authority to collect payments from customers, that testimony does not render a finding of actual authority factually insufficient, as Wallace Roofing conceded at trial that Anthony was its agent and that funds paid to Anthony for work performed by Wallace Roofing should be credited to Benson's account. *See McMillin*, 180 S.W.3d at 201 ("When reviewing a challenge to the factual sufficiency of the evidence, . . . [w]e may not reverse merely because we conclude that the evidence preponderates toward a different answer."). Further, the testimony has no bearing on the scope

20

of Anthony's apparent authority because such authority is based upon a principal's conduct in relation to third parties. Thus, any private agreement Wallace Roofing had with Anthony would not affect the scope of Anthony's apparent authority. *McAlpin*, 17 Tex. at 514 ("Third persons cannot be affected by the private understanding between [agent and principal], which is known only to themselves."). Rather, Anthony's apparent authority is derived from Wallace Roofing's representations and omissions in Benson's roofing contract which led Benson to reasonably assume he had such authority. *See Gaines*, 235 S.W.3d at 183. Accordingly, Wallace Roofing's factual sufficiency challenge also fails.

We conclude there is sufficient evidence to support the trial court's implied finding that Anthony was acting within the scope of his authority when he received Benson's payments, and therefore, the $1,600 in payments Benson made to Anthony should be offset against the amount Benson owed Wallace Roofing under the contract.

### 3. Wallace Roofing's Damages Award

Having determined that Wallace Roofing was entitled to a total payment of $17,017.70 under the roofing contract and that Benson's account should be credited for the $1,600 in payments made to Wallace Roofing's agent, we can now review the sufficiency of the evidence supporting the trial court's award of $255.77 in damages for Wallace Roofing's successful breach of contract claim.

As Wallace Roofing had the burden of proving its damages, it cannot prevail on its legal sufficiency challenge unless its damages were established as a matter of law. *See U.S. Bank, Nat'l Assoc. v. American Realty Trust, Inc.*, 275 S.W.3d 647, 652 (Tex. App.—Dallas 2009, pet. denied). Reviewing the evidence supporting the trial court's damages award, the record shows

21

that: (1) Benson's insurance carrier made payments to Wallace Roofing on behalf of Benson totaling $11,361.93; (2) Benson made payments under the contract totaling $5,400, including the payments she made to Anthony and payments for expenses related to the contract which Wallace Roofing concedes should be credited to her account. Thus, the record shows Wallace Roofing received a total payment of $16,761.93 under the contract. The difference between $17,017.70—the amount Wallace Roofing was entitled to receive under the contract—and $16,761.93—the amount Wallace Roofing actually received under the contract is $255.77, the amount of damages awarded by the trial court. Accordingly, we conclude there is legally sufficient evidence to support the award.

For Wallace Roofing's factual sufficiency challenge, we must consider and weigh all the evidence in the record and set aside a finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). Wallace Roofing contends the damages finding is against the great weight and preponderance of the evidence because Benson's account should not be credited for payments made to its agent. As we have already concluded Benson is entitled to credit under the contract for the payments she made to Wallace Roofing's agent, we conclude the evidence is factually sufficient to support the damages award. We overrule Wallace Roofing's sixth issue on appeal.

### *Wallace Roofing's Constitutional Lien Claim*

In its seventh issue on appeal, Wallace Roofing contends the trial court erred in denying its claim to foreclose on its constitutional mechanic's lien against Benson's homestead. To prevail on a claim to foreclose a constitutional mechanic's lien, a lienholder must prove the performance of the labor and the existence of the debt. *San Antonio Credit Union v. O'Connor*,

22

115 S.W.3d 82, 107–08 (Tex. App.—San Antonio 2003, pet. denied). If the trial court had foreclosed on the constitutional lien in this case, Wallace Roofing would have been entitled to recover only $255.77 for its claim. As the trial court awarded Benson $45,000 in damages and attorneys' fees, any damages Wallace Roofing could have recovered from the constitutional lien claim were fully offset by Benson's damages award. As such, we cannot conclude the trial court abused its discretion in denying Wallace Roofing's foreclosure claim. We overrule Wallace Roofing's seventh issue on appeal.

### *Attorneys' Fees*

In its eighth and ninth issues on appeal, Wallace Roofing contends it was entitled to an award of attorneys' fees under chapter 38 of the Civil Practice and Remedies Code because it prevailed on its breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (authorizing recovery of attorney's fees for valid claims based on oral or written contract). Chapter 38 provides for the recovery of attorneys' fees in breach-of-contract cases, providing that "a person may recover reasonable attorneys' fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." *Id*. Benson defends the award of zero attorneys' fees, contending that Wallace Roofing failed to present its claim for payment to Benson as required, made an excessive presuit demand, and was not a "prevailing party" as required to recover attorneys' fees under chapter 38.

We review a trial court's decision to grant or deny attorneys' fees under an abuse of discretion standard. *EMC Mortg. Corp. v. Davis*, 167 S.W.3d 406, 418 (Tex. App.—Austin 2005, pet. denied). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d

23

682, 687 (Tex. 2002). "When a prevailing party in a breach of contract suit seeks attorney's fees under section 38.001, makes its proof, and meets the requirements of the section, an award of attorney's fees is mandatory." *Flagship Hotel, Ltd. v. City of Galveston*, 117 S.W.3d 552, 563–65 (Tex. App.—Texarkana 2003, pet. denied); *see also Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998). Thus, a trial court "possesses discretion to determine the amount of attorney's fees, but it lacks discretion to deny attorneys' fees if they are proper under section 38.001." *Brent v. Field*, 275 S.W.3d 611, 622 (Tex. App.—Amarillo 2008, no pet.); *Budd v. Gay*, 846 S.W.2d 521, 524 (Tex. App.—Houston [14th Dist.] 1993, no writ).

In order to recover attorneys' fees under chapter 38, Wallace Roofing must show that: (1) it was represented by counsel; (2) it presented its claim to Benson; and (3) Benson failed to pay the just amount owed within thirty days of presentment. Tex. Civ. Prac. & Rem. Code § 38.002. Presentment of a claim is required to allow the person against whom it is asserted an opportunity to pay within thirty days of receiving the claim, before incurring an obligation for attorneys' fees. *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981). No particular form of presentment is required, and it may be written or oral. *Id.* "[A]ll that is necessary is that an assertion of a debt or claim and a request for compliance be made to the opposing party, and the opposing party refused to pay the claim." *Standard Constructors, Inc. v. Chevron Chem. Co., Inc.*, 101 S.W.3d 619, 627 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see also Huff v. Fidelity Union Life Ins. Co.*, 312 S.W.2d 493, 500 (Tex. 1958).

The trial court found that Wallace Roofing failed to present its claim to Benson and denied an award of attorneys' fees. Wallace Roofing, however, contends that Benson's own testimony established presentment of the claim as a matter of law. We agree. According to

24

Benson's undisputed testimony, Wallace Roofing through its attorney informed her of the claim and demanded payment during a telephone conversation occurring after her first closing was canceled. Benson testified the lawyer informed her during the telephone conversation that she owed $5,220.10 on the contract and demanded payment but that she refused to pay any amount on the claim and informed the lawyer she was going to take the claim to court. As Benson testified that Wallace Roofing presented its claim and she refused to tender payment within thirty days, we conclude Wallace Roofing established presentment of the claim as a matter of law.[5]

We must next consider, however, whether Wallace Roofing waived its right to attorneys' fees by presenting an excessive demand. In its initial demand for payment, Wallace Roofing sought $5,220.10 from Benson but at trial only recovered $255.77. Benson contends that Wallace Roofing's demand was excessive and should preclude an award of attorneys' fees. As a general rule, "a creditor who makes excessive demand upon a debtor is not entitled to attorneys' fees for subsequent litigation required to recover the debt." *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981); *Collingsworth v. King*, 283 S.W.2d 30, 33 (Tex. 1955). But the mere fact that a judgment awards an amount less than the original claim presented does not necessarily mean that the original claim presented was excessive. *Findlay*, 611 S.W.2d at 58. Rather, the dispositive inquiry for determining whether a demand is excessive is whether the claimant acted unreasonably or in bad faith. *Pratt v. Trinity Projects, Inc.*, 26 S.W.3d 767, 769 (Tex. App.—Beaumont 2000, pet. denied). Further, "[a]pplication of this rule is limited to situations where the creditor refuses

---

[5] Although Wallace Roofing presented its claim after it had already filed suit, chapter 38 does not require a party to present its claim prior to filing suit. *See Palestine Water Well Servs., Inc. v. Vance Sand & Rock, Inc.*, 188 S.W.3d 321, 327 (Tex. App.—Tyler 2006, no pet.).

25

a tender of the amount actually due or indicates clearly to the debtor that such tender would be refused." *Hernandez v. Lautensack*, 201 S.W.3d 771, 777 (Tex. App.—Fort Worth 2006, pet. denied); *see also Findlay*, 611 S.W.2d at 58.

Here, Wallace Roofing demanded Benson pay $5,220.10 on her roofing contract, but admitted at trial that this amount was incorrect because it had in its possession—at the time it made the demand—documents showing that it had failed to credit Benson's account with a $2,349.33 payment from her insurer. Further, despite Benson and her attorney's communications disputing the amount of the debt, Wallace Roofing persisted in its claim that she owed $5,220.10. Indeed, even after communications with Benson and her attorney, Wallace Roofing continued to assert in its pleadings that Benson owed $5,220.10 and sent a copy of the pleadings to the title company handling the closing for Benson's failed refinance. Given that Wallace Roofing admitted at trial that it made an excessive demand for payment and its actions indicated an unwillingness to accept the actual amount due on the account, we cannot conclude the trial court abused its discretion in denying attorneys' fees.[6] *See Ingham v. Harrison*, 224 S.W.2d 1019, 1022 (Tex. 1949) (demand excessive when creditor refused to allow debtor credits for certain payments); *Warrior Constructors, Inc. v. Small Bus. Inv. Co. of Houston*, 536 S.W.2d 382, 386 (Tex. App.—Houston [14th Dist.] 1976, no writ) (debtor not required to tender payment where creditor has clearly indicated an

---

[6] Almost three months after sending the title company a copy of its pleadings seeking $5,220.10 in damages, Wallace Roofing discovered that it had failed to credit Benson's account with the $2,349.33 payment from her insurer. Upon discovery of the mistake, Wallace Roofing amended its pleadings to lower its requested damages; however, there is no evidence in the record that Wallace Roofing presented Benson with its revised claim and demanded payment. *See Huff v. Fidelity Union Life Ins. Co.*, 312 S.W.2d 493, 500 (Tex. 1958) (act of filing suit is not by itself a demand for payment under chapter 38 sufficient to trigger award of attorneys' fees).

unwillingness to accept what is due). Accordingly, we overrule Wallace Roofing's eighth and ninth issues on appeal.[7]

### *Benson's Cross-Points*

In two cross-points of error, Benson contends she is entitled as a matter of law to greater damages for her counterclaims. An appellee seeking to change the trial court's judgment or to obtain more favorable relief than that granted by the trial court must file its own notice of appeal. *See* Tex. R. App. P. 25.1(c), 26.1(d); *Lubbock Cnty. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 584 (Tex. 2002). As Benson has not filed a notice of appeal, we conclude she has waived this issue on appeal.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: November 27, 2013

_____

[7] In its tenth issue on appeal, Wallace Roofing argued that the trial court erred in granting judgment against Royce Dean Wallace in his personal capacity. In its reply brief, Wallace Roofing concedes this point is moot as the trial court corrected any error in its final judgment nunc pro tunc.